## HYATT and others *vs.* PUGSLEY and others.

23b　　285
39 Mis⁵420

T. Pugsley, being seised in fee of a tract of land called the Cow Neck farm, died intestate, and the land descended to his sons, Isaac L. and Oakley, who were his only heirs at law.　Isaac L. died intestate and without descendants, in the lifetime of his brother, and his half of the farm descended to Oakley Pugsley, who thereupon became and continued to be until the time of his death, seised in fee of the whole of it.　He made a will, containing the following provisions: *" First.* After all my lawful debts are paid and discharged, I give and bequeath unto William Pugsley, Samuel Pugsley, Benjamin Pugsley and James Pugsley, sons of Samuel Pugsley of North Salem, all my household furniture, farming utensils, and what stock I have on the farm where I now reside.　I also give and bequeath unto William, son of James Pugsley of Ossining, my large silver tankard, &c.　I do give and devise unto Samuel Pugsley, William Pugsley and James Pugsley, near Cayuga lake in this state, the farm where I now reside, &c. containing about 160 acres, and the Cow Neck farm.　I do also give and devise unto the said last named Samuel, William, Benjamin and James" three houses in the city of New York.　After specifying several intermediate devises and bequests, the will contained this clause: "I do also give unto William Pugsley, Samuel Pugsley, Benjamin Pugsley and James Pugsley, sons of Samuel Pugsley of North Salem, Westchester county, the personal property aforesaid, and no more."　The testator died in 1853, leaving no living ancestor, nor any descendant, brother or sister, or any descendant of a brother or sister.　His heirs at law were the descendants of the brothers and sister of his father, and of the brothers and sisters of his mother.　The nearest heirs, on each side, were his first cousins.

*Held,* 1. That parol evidence was inadmissible for the purpose of showing that the testator intended to, and did, in effect, devise a portion of the Cow Neck farm to Benjamin Pugsley, (1) because it was designed to explain a patent ambiguity, and (2) because it would, if it could have any effect, create a new devise.　That if Benjamin Pugsley took any interest in the premises, under the will, it was by implication; and that was a question of law, which could not be elucidated by any extrinsic evidence as to the intention of the testator.

2. That the language used by the testator simply raised a conjecture that he might have supposed that he had included Benjamin Pugsley's name as one of the devisees, but that it was too remote either to alter the estate expressly given to others, or to confer any upon him.　And that Benjamin Pugsley took no part of the Cow Neck farm under the will.

3. That James Pugsley, the only surviving devisee named in the will, took thereby only the one-third part of the Cow Neck farm.

4. That the remaining two-third parts of the premises descended to the heirs at law of the testator; and that one of those third parts descended to the descendants of the brother and sister of his father.　That as to such third, the inheritance came to the testator on the part of his father; but as to the remaining third part, being the half of what was not effectually devised, that did not come to him on the part of his father, but it came to him from his brother.

Hyatt *v.* Pugsley.

5. That under the rule that collateral descent from brother to brother is immediate, taking no notice of the father, the one-third part of the farm, being the half of what did not pass under the will, descended to both the paternal and maternal collateral relatives of the testator.

6. That had all the first cousins of the testator survived him they would have inherited equal parts of what descended to them respectively. But that, as several of them had previously died, the cousins must be assumed as the stock, and the inheritance be divided into as many equal shares as there were first cousins living, or who had died leaving descendants.

When an ambiguity, in a will, is apparent from the face of the instrument, the general rule is that it is not susceptible of explanation by extrinsic parol evidence. The will must, in such cases, be its own expounder.

An obscurity purely instrumental cannot be explained by parol evidence. If that is so great that it cannot be discerned with reasonable probability who, or what, is meant by the testator, the provision is deemed insensible, and the proposed gift must fail altogether.

External evidence is necessary, and always admissible, to identify the person or thing sufficiently described to make the devise or bequest effectual. If that points to but one object, or to but one individual, clearly designated in the will, that controls. No evidence can then be received that any other person or thing was intended. But if the extrinsic evidence for identification produces uncertainty as to either, that may be removed or explained by other testimony.

The difficulty may be removed by the same instrumentality by which it is produced. The admissible evidence, in such cases, is always explanatory of person or thing actually expressed in the will. No parol evidence can be received to prove an additional or different subject matter, or some other donee.

Mode of stating the estates and interests of the several owners, in a judgment in partition.

THIS case came before the court on exceptions to the report of the referee in an action for partition. The material facts appear in the opinion of the court.

*F. Larkin*, for the plaintiffs. I. In regard to mistakes in wills, there is no doubt that courts of equity have jurisdiction to correct them when they are apparent on the face of the will, or may be made out by a due construction of its terms; for in cases of wills the intention will prevail over the words. But, then, the mistake must be apparent on the face of the will; otherwise there can be no relief: for, at least since the statute of frauds which requires wills to be in writing, (whatever may have been the case before the statute,) parol evidence, or evi-

dence dehors the will, is inadmissible to vary or control the terms of the will, although it is admissible to remove a latent ambiguity. (*Story's Eq. Jurisp.* § 179, *and authorities cited.*) But a mistake, in order to lead to relief, must be a clear mistake, or a clear omission demohstrable from the structure and scope of the will. Thus, if in a will, there is a mistake in the computation of a legacy, it will be rectified in equity. *So if there is a mistake in the name or description or number of the legatees intended to take,* or in the property intended to be bequeathed, equity will correct it. (*Id.* § 180. *Stebbing* v. *Walkley,* 2 *Bro. Ch.* 85. *Rivers' case,* 1 *Atk.* 410. *Parsons* v. *Parsons,* 1 *Ves. jun.* 266. *Beemont* v. *Fell,* 2 *P. Wms.* 141. *Hampshire* v. *Peirce,* 2 *Ves.* 216. *Braduni* v. *Harper, Ambler,* 374. *Tomkins* v. *Tomkins,* 3 *Atk.* 257.)

II. The court may supply omitted words in a will, to carry into execution the intent of the testator. (1 *Kinne's Law Compend.* 317. *Selden* v. *King,* 2 *Call's Virg. R.* 61. *Lynch and wife* v. *Hill and wife,* 6 *Munf.* 114. *Smith* v. *Bell,* 6 *Pet. R.* 68.) In *Garth* v. *Merrick* there was a bequest of a residue to the testator's six grandchildren by name; but the name of one of them was repeated and that of another omitted; yet all took equal shares. (1 *Brown's Ch. R.* 31.)

III. As William Pugsley, one of the sons of Samuel Pugsley, died in 1838, long before the will was made, it is not a lapsed legacy. A devise is said to be lapsed where the devisee dies in the intermediate period between the making of the will and the death of the testator. (13 *East,* 526.) The referee was right in holding that William Pugsley having died long before the will was made, the will is to be read the same as if his name had never been written in the will.

*Smith Barker* and *William N. Dyckman,* for the defendants. The questions to be discussed relate to the construction to be given to the third clause in the will of Oakley Pugsley, which is as follows: "I do give and devise unto Samuel Pugsley, William Pugsley and James Pugsley, near Cayuga lake in this state, the farm where I now reside in the town of Westchester

aforesaid, containing about 160 acres, called the Cow Neck farm."
It is alleged in the complaint that the testator *intended* that the
name of *Benjamin Pugsley* should have been inserted in this
clause as one of the devisees. It is also stated that Samuel
Pugsley and William Pugsley died before the testator : William
before the making of the will, Samuel after; and it is alleged
that the farm mentioned in the devise came to the testator *from
and on the part of his father*. It is also alleged that the heirs
at law of the testator are the children and descendants of the
brothers and sisters of the testator's father; but the persons
named in the complaint as the heirs at law of the testator, in-
clude the children and descendants of the brothers and sisters
of the testator's *mother* as well as those of his *father*. On the
part of the plaintiff it is contended, that Benjamin Pugsley (al-
though not named in the devise) took an equal share with James
Pugsley of the farm ; that if any part of the farm descended to
the heirs at law of the testator, it descended to the heirs at law
on the part of the *father*, to the exclusion of those on the part
of the *mother*, as the farm came to the testator from or on the
part of the father. On the part of the defendants, on whose be-
half these points are submitted, it is contended : That Benjamin
Pugsley acquired no estate or interest under the devise in ques-
tion, not being named therein ; that parol evidence cannot be
admitted to alter or vary the devise ; that it can only be admit-
ted to explain an *ambiguity* as to the *property devised*, or the
*person* of the devisee. That James Pugsley is the only person
who took any estate or interest in the farm, under the devise in
question ; that he took one-third thereof and no more—and that
the devise of the other two-thirds which Samuel and William
would have taken had they been living, lapsed by their death
before the testator, and that those two-thirds descended to his
heirs at law. That the testator acquired one half of the farm
by descent from his brother Isaac L. Pugsley; and that the
heirs at law of the testator on the part of the mother and those
on the part of the father are together entitled to the one-half of
that part of the farm which by the lapse of part of the devise
in question descended to the testator's heirs at law.

Hyatt *v.* Pugsley.

It is contended that the stocks from which the distribution is to be made are the uncles and aunts and not the cousins of Oakley Pugsley. In all cases where the inheritance descends to the brothers and sisters of the father and mother of the intestate, it is provided that it "shall descend in the same manner as if all such brothers and sisters had been brothers and sisters of the intestate." (1 *R. S.* 752, §§ 10 *to* 13.) Section 8 provides that where some of the brothers and sisters of the intestate are living and some dead, the descent shall be *per stirpes ;* the descendants of the deceased brothers and sisters taking, by representation, the share the parent if living would have taken ; but no provision is made for the case where all the brothers and sisters of the intestate are dead, which is the present case ; for by sections 10 to 13 the brothers and sisters of the intestate's father and mother are to be considered the same as if they were brothers and sisters of the intestate. Section 9 provides that "the same law of inheritance prescribed in the last section [§ 8] shall prevail as to the other direct lineal descendants of *every brother and sister of the intestate whenever such descendants are of unequal degrees.*" In the present case the descendants are of unequal degrees ; and sections 8 and 9 taken together provide that in such cases the descent is to be to the lineal descendants of the brothers and sisters (of the intestate, or of his father or mother as the case may be) to the remotest degree ; and consequently in the present case the stocks from which the distribution is to be made are the uncles and aunts of Oakley Pugsley.

The following points are submitted. I. That Benjamin Pugsley acquired no estate or interest in the premises under the devise in question. " The testator's intention ought to be collected from the words used in the will; and words which he has not used cannot be added." " Courts of law and equity are very cautious in admitting parol evidence, upon the construction of a will. It has been admitted to ascertain the person where there are two of the same name, or where there has been a mistake in the christian or surname," and " to ascertain a *person or thing.*" (1 *Bridgman's Index,* 610, *tit. Devise* 16, § 628, *and the cases there cited. See also Powell on Devises, ch.* 12.

" *Of parol declarations and averments respecting devises,*"
*vol.* 1, *p.* 466, *&c. and cases there cited in the notes.*) The in-
tention of the testator is to be collected from the whole will;
and as a will of lands must be in writing, such collection of the
testator's intention must be derived from the will itself, for no
averment or parol evidence can be admitted to explain any thing
dubious upon the face of the will, except in a few cases which
will be mentioned hereafter.  (6 *Cruise's Dig.* 158, *tit.* 38, *De-
vise, ch.* 9, § 5, *and the cases there cited.*)  In the case of an
*ambiquitas latens* an averment supported by parol evidence is
admissible to explain a will.  (*Id.* 165, *tit.* 38, *Devise, ch.* 9, § 26,
*and the cases there cited.*)  To the general principle that " words
which the testator has not used cannot be added," there is no
exception.  To the general principle that parol evidence cannot
be admitted upon the construction of the words used, there is an
exception ; parol evidence will be admitted where there is an
ambiguity ; and it is allowed to ascertain the person for whose
benefit the devise was intended, or to ascertain what was intend-
ed to be devised.  Unless the words " *Benjamin Pugsley,*"
(which the testator has not used) are added to the devise in ques-
tion there is no ground whatever for claiming for Benjamin any
interest in the premises, under the devise ; and the counsel for
the plaintiffs are called upon to cite any adjudicated case, or any
dictum, where a single word has been added to a devise.  If an
addition is made to a devise, then the will, so far as the addition
goes, is not in writing but by parol ; and can a will be made
part in writing and part by parol ?  If it can, let the counsel
show some adjudication to that effect.  Parol evidence may be
admitted to explain an ambiguity, but cannot be admitted to cor-
rect a mistake where there is no ambiguity.  (*Jackson ex dem.
Van Vechten and others* v. *Sill,* 11 *John.* 201.)  In this case
the testator devised to his wife during widowhood " *the farm
which I now occupy,*" &c. and parol evidence was offered, to
show that the testator intended to include the farm he occupied
and a tract of land adjoining, under lease ; and that by *mistake*
of the person who drew the will, and contrary to the *instructions*
of the testator, the tract under lease was not included.  Mr. Van

Hyatt *v.* Pugsley.

Vechten, who drew the will, stated that the instructions of the testator were repeated and unequivocal that he intended to devise all his real estate in Watervliet, and that it was his [Mr. Van Vechten's] impression that the testator occupied the tract leased. Chief Justice Thompson, who delivered the opinion of the court, states, " The will was drawn by Mr. Van Vechten under a misapprehension of facts ; it is therefore a clear case of mistake. I have industriously searched for some principle that would bear me out in letting in the evidence offered, but I have searched in vain, and am satisfied the testimony *cannot be admitted* without violating the wise and salutary provisions of the statute of wills, and breaking down what have been considered the great landmarks of the law on this subject." Parol evidence is inadmissible to *supply* or contradict or vary the words of a will, or to *explain the intention of the testator*, except there is a latent ambiguity arising dehors the will as to the person or subject meant to be described, or to rebut a resulting trust. (*Mann* v. *Ex'rs of Mann,* 1 *John. Ch.* 231.) In this case the testator bequeathed to his widow " all the rest, residue and remainder of the moneys belonging to his estate at the time of his decease." Parol evidence was introduced showing that the testator *intended* by the words used to include " moneys due on bonds and mortgages." The chancellor decided that such parol evidence was inadmissible ; and his decision was affirmed on appeal. (*See Mann* v. *Mann,* 14 *John.* 1.) These two cases, *Jackson* v. *Sill* and *Mann* v. *Mann,* settle the law in this state in relation to the admissibility of parol evidence in the construction of a will. In these two cases there was no question as to the *intention of the testator*, and the proof was clear that there was a *mistake ;* but in neither case was *parol evidence admitted* to correct the mistake. In the present case the evidence brought forward to show the *mistake* is so vague and uncertain that no reliance can be placed upon it, even if it were admissible. Mr. Findley, who drew the will, in answer to the 1st question says, " I judge *from reading the will* that he intended to include them all ; whether *his* or *my* mistake I don't know. I have no recollection on the subject *except what is contained in the will ;*

my memory is oblivious on that point." And in answer to the 2d question he says, " I am at a great loss to determine, reflecting on the two clauses and the circumstances existing at the time of making the will, *whether he omitted* to name Benjamin in the first clause, or whether *I* inserted the words " the said" by way of mistake, in the next clause ; or whether *he intended only three in first clause and four in the second*, and *I* made the mistake." On his cross-examination he was asked, " At the time of the execution of the will did you read it as it is, to the testator, from beginning to end ?" He answered, " Yes sir, I always do that from beginning to end." The testimony of James Hyde and George Hyde could under no circumstances be admitted, so far as they relate to the instructions given by the testator to Mr. Findley. If proof of those instructions could be received it must be given by Mr. Findley ; they cannot be allowed to state what the testator told Mr. Findley. As to the declarations made by the testator *after the making the will*, they could in no case be admitted to aid in the construction of the will.

II. Under the devise in question, James Pugsley became entitled to one-third of the premises in dispute and no more ; and the other two-thirds descended to the heirs at law of the testator. The devise is to Samuel, William and James, and had they all survived the testator they would *each* have become entitled to *one-third ;* there being no provision that in case of the death of either, his share should go to the survivors, James can have no claim to any part of the shares of Samuel and William. The devise of the *two-thirds* to Samuel and William *lapsed* by their death before the testator, and as a necessary consequence descended to the testator's heirs at law. It is a rule that if the devisee die before the devisor, the devise becomes void. (6 *Cruise's Dig.* 150, *tit.* 38, *Devise, ch.* 8, §§ 9 *to* 27, *and cases there cited.*)

III. The testator having acquired his title to one-half of the premises by descent from his brother Isaac, the one-half of that part of the premises which did not pass by the devise in question, descended to his heirs at law ; as well those on the part of the mother as those on the part of the father. The canons of descent applicable to the present case are found in the re-

Hyatt *v.* Pugsley.

.vised statutes, *part* 2, *ch.* 2, §§ 10 *to* 13, 29. ( *Vol.* 1, *p.* 752.) The heirs at law of the testator are the children, and the descendants of deceased children, of both the father and mother of the testator. By the provisions of the revised statutes, above referred to, the heirs on the mother's side are excluded when the inheritance shall have come on the part of the father; and the heirs on the father's side excluded when the inheritance shall have come on the part of the mother; and where the inheritance has not come on the part of either the father or mother, it shall descend to the brothers and sisters both of the father and mother, and to their descendants, in the same manner as if all such brothers and sisters had been brothers and sisters of the intestate. (§ 13.) On the part of the defendants it is admitted that as to one-half of the premises, the inheritance came to the testator on the part of his father; and that the heirs on the mother's side can have no interest in that part; but it is contended that as to the other half the inheritance has not come on the part of either father or mother, and therefore it descended to the heirs on the side of both father and mother. That the inheritance, as to one-half of the premises, came to the testator by descent from his brother Isaac is not questioned; it did not therefore come to the testator on the part of either the father or mother, and thus comes within the provisions of § 13. By § 29 of the revised statutes, above referred to, the expressions "where the estate shall have come on the part of the ".father" or "mother" as the case may be, shall be construed to include every case where the inheritance shall have come "by devise, gift or descent from the parent referred to, or from any relative of the blood of such parent." If it should be contended that in this case, as to the one-half derived by descent from the testator's brother, the heirs on the mother's side should be excluded, because the inheritance came by descent from a relative of the blood of the father; it might with equal propriety be contended that the heirs on the father's side should be excluded; for was not Isaac L. Pugsley, by descent from whom, this half came, a relative of the testator of the blood of his mother ? Where the inheritance came by descent

from a relative of the blood of father and mother equally, there it must descend to the brothers and sisters (and their descendants) of both father and mother : the heirs on neither side can be excluded. In the case of *Jackson* v; *Green*, (7 *Wend.* 333,) Chief Justice Savage states that the descent from brother to brother is immediate.

In order to carry out the principles above stated, it is contended that the court should decree, that Benjamin Pugsley took no interest in the premises under the devise in question; that James Pugsley took an estate in fee in one-third only of the premises. That the other two-thirds descended, to the heirs at law of Oakley Pugsley ; that the heirs on the father's side are entitled to one-half of the part which descended, to the exclusion of the heirs on the mother's side ; that the heirs on the father's and mother's side are together entitled to the other half of the part which descended ; that the distribution among the heirs is to be made *per stirpes* and not *per capita ;* that the stocks from which the distribution is to be made are the *uncles and aunts* of Oakley Pugsley, (the brothers and sisters of his father and mother,) or his *cousins*, (children of those brothers and sisters,) it being in evidence that, at the death of Oakley, all his uncles and aunts were dead, and that there were living persons who were children of his uncles and aunts.

S. B. STRONG, J. This is an action for the partition of a tract of land known as the Cow Neck farm, in the town and county of Westchester, between the plaintiffs and defendants and other owners who, or whose interests, are unknown. One Talman Pugsley was at the time of his death seised in fee simple absolute of the farm, which he had purchased from Stephen Leggett. Talman Pugsley died intestate, and the land thereupon descended to his sons, Isaac L. Pugsley and Oakley Pugsley, who were his only heirs at ·law. Isaac L. Pugsley died intestate and without descendants, in the lifetime of his brother, and his half of the farm descended to Oakley Pugsley, who thereupon became and continued to be until the time of his death, seised in fee of the whole of it. Oakley Pugsley made

a will containing with other provisions the following consecutive clauses:

"First. After all my lawful debts are paid and discharged, I give and bequeath unto William Pugsley, Samuel Pugsley, Benjamin Pugsley and James Pugsley, sons of Samuel Pugsley of North Salem, all my household furniture, farming utensils, and what stock I have on the farm where I now reside.

I also give and bequeath unto William, son of James Pugsley of Ossining, my large silver tankard, also eighteeen silver spoons—nine large ones, and nine small ones— also four silver watches and sugar tongs.

I do give and devise unto Samuel Pugsley, William Pugsley and James Pugsley, near Cayuga lake in this state, the farm where I now reside, in the town of Westchester aforesaid, containing about one hundred and sixty acres, called the Cow Neck farm.

I do also give and devise unto the said last named Samuel, William, Benjamin and James, two houses and lots: One of said houses is numbered (31) thirty-one Hester street, and the other, No. 14 Norfolk street, in the city of New York; also one house and lot number 353 Division street."

The will, after specifying several intermediate devises and bequests, contains the following clause:

"I do also give unto William Pugsley, Samuel Pugsley, Benjamin Pugsley and James Pugsley, sons of Samuel Pugsley, of North Salem, Westchester county, the personal property aforesaid, and no more."

There was a codicil to the will, but it had no reference to the Cow Neck farm, nor did it contain any provision affecting the questions involved in this action. There was no residuary devise. The testator died in 1853, leaving his will and codicil in full force, and they were subsequently duly proved before the surrogate of the county of Westchester. He had not at the time of his death any living ancestor, nor any descendant, brother or sister, or any descendant of a brother or sister. His heirs at law were the descendants of the brothers and sister of his father, Talman Pugsley, and of the brothers and sisters of his mother, whose maiden name was Sarah Oakley. The

nearer heirs on each side were his first cousins. Several of his former first cousins had died, some without, and others leaving descendants.

The action was referred, for the purpose of ascertaining the facts, and those which I have stated were proved before the referee, and reported by him, together with his conclusions on various questions of law. One of his conclusions is that, as well from the parts of the will which I have quoted as from the extrinsic evidence which he received, the testator intended to, and did, in effect, devise a portion of the farm in question to his cousin Benjamin Pugsley, who is one of the defendants in this suit, and claims such interest. The counsel for several of the other parties objected to the admission of the parol evidence and excepted to the conclusion adopted by the referee. The questions resulting from this action of the learned referee are important, and were discussed by the counsel who appeared before me, with great ability.

There is no obscurity in the devise itself, nor in its application. The farm is accurately designated, and the three devisees are appropriately named. There may be some doubt whether the testator did not intend to give the farm to the three devisees named and Benjamin Pugsley, from the bequest to the four of the household furniture, farming utensils and stock on it, and from the phraseology of the clause next following the devise in question, in which he says : "I do also give and devise unto the said *last* named Samuel, William, *Benjamin* and James" three houses and lots in the city of New York. It is certainly singular that the testator should have given the farm to three of his cousins, and the furniture, stock and utensils on it to the three and another person, and it raises an inference that there must have been some mistake ; but neither of the provisions would indicate in which of them the mistake was made. The presumption would seem to be that the greater accuracy would qualify the more important gift of the real estate. Then as to the words in the succeeding clause "the said last named," they certainly raise a presumption that the four were named together in what immediately precedes it. That is weakened,

Hyatt *v.* Pugsley.

however, by the consideration that the expressions "last named" were necessary to designate Samuel, James and William, as other persons having the same names had been previously mentioned. The epithets may have been designed for them only, as they were unnecessary for Benjamin, who was the only person of that name mentioned in the will. Whatever ambiguity existed, however, was apparent from the face of the will; and the general rule in such cases is that it is not susceptible of explanation from extrinsic, parol evidence. The will must then be its own expounder. Lord Bacon, after stating in his 23d rule the maxim, "*ambiguitas verborum latens verificatione suppletur ; nam quod ex facto oritur ambiguum verificatione facti tollitur,*" observes, "There be two sorts of ambiguities of words : the one is ambiguitas patens and the other latens. Patens is that which appears to be ambiguous upon the deed or instrument ; latens is that which seemeth certain and without ambiguity, for any thing that appeareth upon the deed or instrument ; but there is some collateral matter out of the deed that breedeth the ambiguity.

"Ambiguitas patens is never holpen by averment, and the reason is, because the law will not couple and mingle matter of specialty, which is of the higher account, with matter of averment, which is of inferior account in law; for that were to make all deeds hollow, and subject to averments, and so, in effect, that to pass without deed, which the law appointeth shall not pass but by deed." It is apparent from those considerations that an obscurity purely instrumental cannot be explained by parol evidence. If that is so great that it cannot be discovered with reasonable probability who, or what is meant by the testator, the provision is deemed insensible, and the proposed gift must fail altogether. External evidence is necessary, and always admissible, to identify the person or thing sufficiently described to make the devise or bequest effectual. If that points to but one object, or to but one individual clearly designated in the will, that controls. No evidence can then be received that any other person or thing was intended. But if the extrinsic evidence for identification produces uncertainty as

to either, that may be removed or explained by other testimony. The difficulty may be removed by the same instrumentality by which it is produced. The admissible evidence in such cases is always explanatory of person or thing, actually expressed in the will. No parol evidence can be received to prove an additional or different subject matter, or some other donee. If that should be allowable, the will would be partly in writing and partly by parol, and as to the latter, it would be without any of those solemnities which our statutes wisely require to render it effectual. Much of the evidence adduced before the referee went to show the intention of the testator, as evinced by his declarations at different times, and his instructions when the will was drawn to include Benjamin Pugsley among the devisees of the Cow Neck farm. It is undoubtedly desirable that the intentions of a testator should prevail, so far as they can do so consistently with conservative rules. But it is very essential that there should be an intimation of the intent in the will, and that the proof should be confined to what is expressed. In other words, that such proof should be strictly explanatory. There can be but little danger in allowing explanations of what is written, but it would be hazardous in the extreme to permit alterations or additions to be made from the uncertain recollections of witnesses, and particularly in reference to such evanescent matters as conversations. The parol evidence before the referee in this case was inadmissible, first, because it was designed to explain a patent ambiguity ; and secondly, because it would, if it could have any effect, create a new devise.

If Benjamin Pugsley took any interest in the premises, under the will, it must have been by implication. That is a question of law which could not be elucidated by any extrinsic evidence as to the intention of the testator, nor justify its admission. As to that, what is stated in the instrument must control. The rule in such cases is well expressed by Mr. Jarman in a note to *Powell on Devises*, ( *Vol.* 1, *p.* 336,) as follows : " that if a testator *unequivocally* refer to a *disposition* as made in that his will which in fact he has not made, the court will regard it as an inadvertent omission, and will

Hyatt *v.* Pugsley.

accordingly supply it." In this case the testator does not unequivocally, or at all, refer to a disposition in favor of Benjamin Pugsley of any part of the farm in question, as actually made. The language used by him simply raises a conjecture that he may have supposed that he had included his name as one of the devisees, but it is too remote either to alter the estate expressly given to others, or to confer any upon him. My opinion is, that Benjamin Pugsley took no part of the Cow Neck farm, under the will.

The referee states that William Pugsley, one of the proposed devisees, died before the will was made, and that Samuel Pugsley; another of such devisees, died in the intermediate time between the date of the will and the death of the testator, and he correctly concludes that the devise to Samuel lapsed. I do not agree with him, however, that in consequence of such premature death of William, the devise must be read as if his name had been omitted, and as giving the entire estate to the others. That would have been the rule had the devise been to a class, in general terms, without any further designation, such as children, brothers, or sisters of a particular individual, although it should contain a less number than what was expressed by the testator at the time. That is well, and no doubt correctly settled. The fair inference in such cases is, that the testator intended to give the entirety to those who might come within the designation, whatever might be the number; and indeed the application would be precisely according to the terms and effect of the language. The same rule prevails where the devise is to several as joint tenants. But the rule is different where, as in this case, the devise is to several *nominatim,* and in effect as tenants in common. Then the gift is of a specific portion to each, and if that intended for either fails in consequence of his earlier decease, it descends to the heir. (*Creswell* v. *Cheslyn,* 3 *Bro. P. C.* 240, 2d ed. 123.) The rule is that the heir always takes what is not effectually devised to others. (*Wright* v. *Hall, Fort.* 182. *S. C. under the title of Wright* v. *Horne,* 8 *Mod.* 224. *Roe* v. *Flood, Fort.* 184.) I must therefore decide that James Pugsley, the

only surviving devisee named in the will, took thereby only the one-third part of the Cow Neck farm. The referee came to that conclusion, although for a different reason.

I agree with the referee that the remaining two-third parts of the premises descended to the heirs at law of the testator, and that one of those third parts descended to the descendants of the brothers and sisters of his father. Clearly as to such third the inheritance came to him on the part of his father. But as to the remaining third part, being the half of what was not (as it turned out) effectually devised, that did not come to the testator on the part of his father, but it came to him from his brother. Property may be said to come to one on the part of his father, when it descended directly from the father, or through him, as a medium; but certainly not where it came to him by descent immediately from another. Thus, if the property descended from any blood relative of the father more remote than the brother of the propositus, it must come through the father as a medium, and it is on *his* part. But the descent from brother to brother is, by the rule of the common law, considered to be immediate, that is, from one directly to the other, and not through, or on the part of, the father. (*Collingwood* v. *Paca*, 1 *Ventr.* 413.) The rule was recognized as existing in this state, by Chief Justice Savage, in *Jackson* v. *Green*, (7 *Wend.* 333.) The learned chief justice in that case, (p. 338,) quotes as law the opinion of Lord Hale, that collateral descent from brother to brother is immediate, *taking no notice of the father;* and he adds, "Hence one brother may inherit from another, though the father be an alien, or attainted." The reason of this peculiar rule is not very obvious, but with our endorsement of the common law it must prevail until it shall be (if ever) repealed. Under that rule I must decide that the one-third part of the farm in question, being the half of what did not pass under the will, descended to both the paternal and maternal collateral relatives of the testator.

It was insisted by one of the counsel, on the argument, that whatever descended to the children or other descendants of the uncles and aunts should be divided into as many shares as there

Hyatt v. Pugsley.

were uncles and aunts who had left descendants living at the death of Oakley Pugsley, and that the descendants of each should take what would have been inherited by his ancestor if living. I do not so construe our statute of descents, (1 *R. S.* 751.) By the 7th section it is provided that where the descent is to collateral relatives all of equal degree of consanguinity to the intestate, the inheritance shall descend to them in equal parts, *however remote from the intestate the common degree of consanguinity may be.* As in this case all the uncles and aunts died in the lifetime of the (partially) intestate, his nearest surviving relatives were his first cousins, and if all his first cousins had survived him they would have inherited equal parts of what descended to them respectively. But as several of them had previously died, the question arises whether the cousins must not be assumed as the stock, and the inheritance be divided into as many equal shares as there were first cousins living, or who had died leaving descendants. My opinion is that such is the division required by our canons of descent. The 8th section of our statute of descents provides that where the descent is to brothers and sisters, and the descendants of any of them who may have died, each living brother and sister shall inherit the share which would have descended to him or her had all the brothers and sisters who shall have died leaving issue been living, and so that such descendants shall inherit the share which their parent would have received if living. The 9th section directs that the same law of inheritance prescribed in the preceding section shall prevail as to the other direct lineal descendants of any brother and sister of the intestate to the remotest degree, whenever such descendants are of unequal degree. Taking the 7th, 8th and 9th sections together, the rule is established that where the inheritance descends to or through brothers or sisters, or both, the primary division shall be made between the nearer surviving relatives and the descendants of those of the same degree who may have died, so that the descendants of each shall collectively take the share which would have fallen to their ancestor had he or she been living. That makes the two canons, one relating to descendants (sections 3 and 4) and the other to

collateral relatives, substantially the same. The 10th section of the same statute provides that when the inheritance shall be to or through the brothers and sisters of the father, whether all of them shall be living, or some of them shall be living and others shall have died leaving descendants, or all of them shall have died, all, any or either of them leaving descendants, the inheritance shall descend in the same manner as if all such brothers and sisters had been the brothers and sisters of the intestate; and the 13th section directs that when the inheritance shall descend to or through the brothers and sisters both of the father and mother, it shall go to such brothers and sisters in equal shares, *and to their descendants,* in the same manner as if all such brothers and sisters had been the brothers and sisters of the intestate. The directions as to the division between the nearer living collateral relatives and the descendants of the dead of the same degree, are not as specific as those in reference to the descendants of the intestate, but it is evident that it was designed to make the rules homogeneous, and there is sufficient in the statute to effectuate such intent. My conclusion is that the division in this case must be made according to the indicated interpretation of our canons of descent.

The four plaintiffs are seised in fee under the conveyance to them from James Pugsley, son of Samuel Pugsley, and from James Underhill, of the undivided portions of the Cow Neck farm to which the former was entitled as one of the devisees and also as one of the heirs at law of Oakley Pugsley, and the latter as one of such heirs, and the plaintiffs Hyatt and Cobb are in addition seised in fee under a conveyance to them from Isaac Pugsley, another heir of Oakley Pugsley, of the share which had descended to him at the time of such conveyance. It is impossible to ascertain from the report of the referee the precise interest which each or any of the heirs of Oakley Pugsley took, as such, in the premises in question. It is necessary, as I conceive, that the estate of each known owner, or of the defendants or some of them, collectively when their rights between each other are disputed, (*Phelps* v. *Green,* 3 *John. Ch.* 302,) should be stated in the judgment. There can be no objection to a

Hyatt *v* Pugsley.

statement that certain definite portions belong, collectively, to owners who are unknown. They may be described in general terms, as the descendants of a person deceased. In the instance of unknown owners, however, the statute requires a direct allegation in the complaint that they are unknown, and also the publication of a notice to them. (2 *R. S.* 319, § 12; 329, § 84.) The averment in the complaint in this action that there are certain unknown owners, although their exact interests are not specified, may be sufficient to authorize the subsequent proceedings as to them, and a judgment to be entered which shall bind their interest, if the requisite notice has been published. If no such notice has been published, it may yet be done, and the subsequent proceedings must be readopted. The plaintiffs cannot, as they have attempted in their complaint, call on the devisees who are known and named by them, to answer in behalf of, or in any manner to represent, the heirs at law of their deceased relative, who are unknown.

The case must go back to the referee to ascertain and report the precise interest of each plaintiff, and also, so far as it can be ascertained, of each other known owner, and also of the unknown owners, or of each class of those who are wholly or partly unknown. If from such report it shall appear that there are owners who are known but not named as parties to this action, they may be brought in as new parties, and the names of the defendants who never had, or who have not now, any interest in the premises, if it should appear from the report that there are any such, may be struck out.

The reasons given by the referee for the sale of the farm, are satisfactory. If the renewed report of the referee shall be satisfactory as to the interests of the parties and the unknown owners, and the requisite proceedings have been adopted to conclude the latter, a judgment may be entered, upon filing the report, conformable to the principles which I have indicated, and for a sale of the premises by Calvin Frost, Esq. who has been selected by the parties as a referee for that purpose.

Further directions will of course be given, if necessary.

[KINGS SPECIAL TERM, December 2, 1856. *S. B. Strong*, Justice.]